UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANGEL MARTINEZ ALICEA, et. al., )
       Plaintiffs )
)
)
       v. )   Civil Action No. 10-30002-MAP
)
)
LT'S BENJAMIN RECORDS, et. al., )
       Defendants )

REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS'
MOTIONS TO DISMISS (Document Nos. 11 and 29)
December 13, 2010

NEIMAN, U.S.M.J.

This is a copyright infringement case brought by several Springfield, Massachusetts music artists, Angel Martinez Alicea (herinafter "Ruf El Fantaztiko"), Reynaldo Colon Vega (hereinafter "Limits"), Gerry Capo-Hernandez (hereinafter "Lionize"), Freddy Montalvo (hereinafter "Montalvo"), and Raul Rivera-Roldan (hereinafter "Thilo") (together "Plaintiffs"). Plaintiffs seek, among other claims, to recover damages for breach of contract, copyright infringement, and intentional and negligent infliction of emotional distress.

Motions to dismiss have been filed by two separate sets of defendants: (1) UMG Recordings, Inc. and Machete Music (together "UMG/Machete"); and (2) Ramon Ayala (hereinafter "Daddy Yankee"), El Cartel Records, Inc. ("El Cartel"), and Los Cangris, Inc. ("Los Cangris") (together the "Daddy Yankee Defendants"). A third set of defendants -- LT's Benjamin Records ("LT's"), Francisco Saldana (hereinafter "Luny"),

Victor Cabrera (hereinafter "Tunes") and White Kraft Music Publishing ("White Kraft") (together the "Luny Tunes Defendants") -- have remained silent.[1]

Both motions to dismiss assert that Plaintiffs have failed to state claims pursuant to Fed. R. Civ. P. 12(b)(6). The Daddy Yankee Defendants also assert lack of personal jurisdiction (Rule 12(b)(2)) and improper venue (Rule 12(b)(3)). The motions have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons which follow, the court will recommend that UMG/Machete's motion to dismiss be allowed with respect to the emotional distress claims, but otherwise denied, and that the Daddy Yankee Defendants' motion be allowed, in full, on personal jurisdiction and venue grounds.

I. STANDARDS OF REVIEW

When faced with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept the allegations of the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Coyne v. City of Somerville*, 972 F.2d 440, 443 (1st Cir. 1992). Moreover, "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Sepulveda-Villarini v. Dep't of Educ. of P.R.*, --- F.3d --- , slip op. at 8 (1st Cir. Dec. 10, 2010). Recently, the Supreme Court made clear that, under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007),

---

[1] The Luny Tunes Defendants are silent because service has only been returned for one of them -- Luny -- and a default has been entered against him. (See Document Nos. 42 and 47.)

2

a complaint that states a plausible claim for relief, on its face, will survive a motion to dismiss. See *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). In *Iqbal*, the Court stated that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

In some contrast, a plaintiff, with regard to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, has the burden of proving that jurisdiction lies with the court. *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (citing cases). In particular, the plaintiff must show that the state's long-arm statute grants jurisdiction and that the exercise of jurisdiction is consistent with the Due Process clause of the United States Constitution. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 52 (1st Cir. 2002). To meet this burden, the plaintiff "must go beyond the pleadings and make affirmative proof" of material jurisdictional facts. *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir. 1992) (citations omitted). It should be noted, however, that a court in this instance "does not act as a factfinder; to the contrary, it ascertains only whether the facts, duly proffered, fully credited, support the exercise of personal jurisdiction." *Alers-Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 84 (1st Cir. 1997).

## II. BACKGROUND

The relevant facts follow. It should be noted that these facts have been garnered from Plaintiffs' *Third* Amended Complaint -- the court having this day allowed their motions to amend their complaint yet again -- even though the motions to dismiss

3

technically target the *Second* Amended Complaint. Unless otherwise noted, the Second and Third Amended Complaints are similar enough so as to not affect the court's recommendation. Additional facts pertaining to personal jurisdiction and venue will be addressed below.

Plaintiffs are musical composers, producers, arrangers, and performers. In summary, they allege that certain of their works were unlawfully used to create musical compositions which were included as musical tracks on an album entitled "Luny Tunes Presents: Erre XI" and another musical composition entitled "Salgo Pa La Calle." (Third Amended Compl. ¶ 1.) Plaintiffs further allege that "Salgo Pa La Calle," in turn, was included as musical track number seven on an album and on the soundtrack to a film, both of which were entitled "Talento de Barrio." (*Id.*)

In early Spring of 2007, two of the non-appearing defendants -- "Luny" and "Tunes" -- contacted one of the plaintiffs, "Lionize," and invited him to their recording studio in Carolina, Puerto Rico, to record and perform certain works and to perform as a member of the duo "Erre XI" on the album "Luny Tunes Presents: Erre XI." (*Id.* ¶ 21.) Lionize agreed and signed exclusive management and recording agreements with LT's -- the successor in interest of an entity known as "Mas Flow, Inc." -- in which he was promised certain royalty payments for his efforts as a musician. (*Id.* ¶¶ 22, 23.)

Shortly after arriving in Puerto Rico, Lionize suggested that three other individuals who have since become plaintiffs here -- "Ruf El Fantaztiko," "Limits," and "Montalvo" (who along with Lionize are known as the "Springfield Crew") -- be invited to help complete the album and other works. (*Id.* ¶ 24.) Luny invited them. (*Id.* ¶ 25.) In

June of 2007, these other members of the Springfield Crew signed similar "exclusive" agreements with LT's. (*Id.* ¶¶ 26-30.)

For the next seven to twelve months, the Springfield Crew worked diligently to compose, produce and perform between thirty to forty musical works. (*Id.* ¶ 33.) During this time, they allege, they had to live in one room of Luny's house, without furniture, and to sleep on the floor; they called this room the "Luny Bin." (*Id.* ¶¶ 34, 35.) In any event, they created a number of compositions, including "Salgo Pa La Calle." (*Id.* ¶ 36.) Other compositions they created included "La Carta," "MSN," "Ella Me Amo," "Carita Bonita," "Dimelo," "Al Desnudo" and "Te Hice Volar." (*Id.*) Since that time, however, Plaintiffs claim they have not received any royalties in connection with the sale of "Luny Tunes Presents: Erre XI" and/or the other album at issue, "Talento de Barrio." (*Id.* ¶ 37.)

Plaintiffs further allege that the Luny Tunes Defendants, along with "Daddy Yankee" himself, took their compositions "in whole, in part and in re-edited versions"; "commercially released and distributed" these infringing musical works via UMG/Machete, White Craft, El Cartel and Los Cangris; and "falsely and fraudulently attributed authorship of [those] Works to themselves by identifying themselves as the sole writers, producers and performers" of the compositions. (*Id.* ¶¶ 38, 41.) Moreover, Plaintiffs assert, the two albums at issue have achieved enormous critical and commercial success with "Talento de Barrio" selling over one million albums worldwide. (*Id.* ¶ 42.)

Separately, Plaintiffs allege that as early as 2004, Luny contracted "Thilo," now a

5

plaintiff as well, to be his producer and that Thilo, in fact, produced many successful works (including certain "beats"). (*Id.* ¶ 43.) Thilo, Plaintiffs allege, "has been paid very little of his royalties from radio and other performances, and no mechanical royalties." (*Id.*)

Turning in yet another direction, Plaintiffs also allege that Luny and LT's "had a distribution agreement with UMG from 2004-2007 (signed on April 24, 2007) and[,] beginning on August 13, 2007, an exclusive recording/distribution agreement, until allegedly terminated by UMG for breach by Luny." (*Id.* ¶ 44.) Copies of the April 24, 2004 agreement (hereinafter the "2004 Distribution Agreement") and the August 13, 2007 agreement (hereinafter the "2007 Profit Sharing Agreement") have been supplied by UMG/Machete and, without objection, considered part of the complaint for present purposes.[2]

According to Plaintiffs, the 2007 Profit Sharing Agreement "required Luny and [LT's] to produce exclusively for Machete . . . and UMG, provided Luny and LT's . . . could produce works for other clients if UMG was notified, gave approval, and was paid a percentage." (*Id.* ¶ 45.) Continuing, Plaintiffs allege the following: that "UMG claims Luny breached said agreement by producing an unauthorized work, and terminated the

---

[2] To be precise, Plaintiffs allege (wrongly) that the 2007 Profit Sharing Agreement is actually attached to the complaint and vaguely imply that both agreements are incorporated therein. Regardless, Plaintiffs have not objected to UMG/Machete supplying the actual agreements (Document No. 13) as part of their motion to dismiss. *See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (at motion to dismiss stage, court may properly consider "documents the authenticity of which are not disputed by the parties[,] . . . official public records[,] . . . documents central to plaintiffs' claim . . . [and] documents sufficiently referred to in the complaint.")

6

contract sometime after August of 2007"; that "[i]n December of 2009, Luny filed suit against [UMG] and Machete for breach of said agreement"; and that UMG "then timely removed" the 2009 action to the United States District Court for the Southern District of Florida, Civil Action No. 09-23370-KMM. (*Id.*) Plaintiffs also contend that they are "third party beneficiaries" of the 2007 Profit Sharing Agreement. (*Id.* ¶ 46.)

### III. DISCUSSION

The court begins with UMG/Machete's motion to dismiss and, for reasons which follow, will recommend that it be allowed with respect to Plaintiffs' emotional distress claims (Counts VII and VIII) but denied with respect to Plaintiffs' claims of vicarious copyright infringement (Count VI) and breach of contract (Count X). The court will then address the Daddy Yankee Defendants' motion to dismiss and, in turn, recommend that it be allowed, in full, on personal jurisdiction and venue grounds.

#### A. UMG/Machete's Motion to Dismiss

It appears that only four counts from the Third Amended Complaint are addressed by UMG/Machete in their motion to dismiss: Count VI (vicarious copyright infringement), Count VII (intentional infliction of emotional distress), Count VIII (negligent infliction of emotional distress), and Count X (breach of contract). The court separately addresses these causes of action.[3]

---

[3] It should be noted that the court has *not* addressed several other counts from the Third Amended Complaint in which, it appears, UMG and Machete have been targeted for the first time, *i.e.*, Count IV (direct copyright infringement), Count V (contributory copyright infringement), and Count XI (raising other breach of contract allegations). Since those counts have not been briefed, the court offers no opinion as to their viability.

7

1. *Emotional Distress (Counts VII and VIII)*

Plaintiffs' emotional distress claims can be dealt with in short order. In their opposition brief, Plaintiffs acknowledge that these causes of action were intended to target only Defendant Luny and, in fact, Plaintiffs' Third Amended Complaint appears to completely eliminate UMG/Machete as targets of these claims. Defendant Luny, it should be remembered, has been defaulted in this action. Therefore, the court will recommend that UMG/Machete's motion with respect to Counts VII and VIII be allowed.

2. *Vicarious Copyright Infringement (Count VI)*

Count VI is a vicarious copyright infringement claim which UMG/Machete argues lacks a fundamental prerequisite, copyright registration. For the following reasons, however, the court believes that Count VII ought not be dismissed as to UMG/Machete at this time.

The Copyright Act states that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made." 17 U.S.C. §§ 411(a). *See also Quincy Cablesystems, Inc., v. Sully's Bar, Inc.*, 650 F. Supp. 838, 850 (D. Mass. 1986). ("Copyright registration under §411(a) is a condition precedent to filing an infringement action."). Here, UMG/Machete asserts that Plaintiffs' vicarious copyright infringement claim should be dismissed as to them inasmuch as Plaintiffs have neither pled that they have registered the copyrights for any musical works which are the subject of this action nor attached any evidence of the registration to their complaints. As became clear at oral

8

argument, however, these facts are not so straight forward.

For one thing, Plaintiffs, in all of their complaints, have specifically alleged that they have complied with the registration requirements of the Copyright Act. (See, *e.g.,* Third Amended Complaint ¶ 48.) In addition, Plaintiffs attached to their original memorandum of law evidence from the United States Copyright Office that appears to indicate that registration is in progress. (Pls.' Opp'n, Ex. A at 2.) Moreover, UMG/Machete appears to concede in its reply brief that Plaintiffs have registered copyrights for at least *sound recordings*. (UMG/Machete's Reply at 2.)

Nonetheless, UMG/Machete contends that Plaintiffs have failed to register copyrights for the *compositions* Plaintiffs claim to have written. In response, Plaintiffs have asserted they are currently in contact with the United States Copyright Office regarding the "pending registrations" in an effort to complete the registration process for the compositions in addition to the sound recordings. (Pls.' Sur-reply ¶ 15. See also Pls.' Motion to Amend (Document No. 50) at 2 (indicating that Plaintiffs "have filed the copyright registration, paid the fee, and uploaded the necessary files to complete registration").) Still, UMG/Machete argues, Plaintiffs' registration efforts keep falling short. (See UMG/Machete's Opp'n to Pls.' Motion to Amend (Document No. 54).)

As indicated, in order to survive a motion to dismiss, a complaint must merely state a plausible claim for relief on its face. *Iqbal*, 1295 S. Ct. at 1940. In the court's opinion, Plaintiffs have met that burden here. As noted, the Third Amended Complaint, like its predecessors, specifically indicates that Plaintiffs have complied with the registration process required by section 411(a). Plaintiffs have also attached evidence

9

of the registrations -- albeit in progress -- in support of this claim. Accordingly, without precluding UMG/Machete from raising the issue again, the court believes that Count VI of Plaintiffs' Third Amended Complaint survives UMG/Machete's motion to dismiss and the court will so recommend.

  3. *Breach of Contract (Count X)*

UMG/Machete also argues that Plaintiffs lack standing to assert their original breach of contract claim since they are not third-party beneficiaries of the 2007 Profit Sharing Agreement between Machete and co-defendants LT's and Luny. In response, Plaintiffs assert that language in the 2007 Profit Sharing Agreement indicates that they are, in fact, third-party beneficiaries. For present purposes, the court believes Plaintiffs have the stronger argument.

In order to recover as a third party beneficiary to a contract, "[i]t must appear from the language and circumstances of the contract that the parties to the contract clearly and definitely intended the beneficiaries to benefit from the promised performance." *Miller v. Mooney*, 725 N.E.2d 545, 550 (Mass. 2000) (citations and internal quotation marks omitted). Moreover, under Massachusetts law, interpretation of a contract is a question of law to be decided by the court unless the contract is ambiguous. *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004). A contract, however, can be found ambiguous if its "terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Id*. (citations and internal quotation marks omitted). Moreover, a court may make "a threshold finding of ambiguity if the

contractual language is susceptible of more than one meaning and reasonably intelligent persons could differ as to which meaning is the proper one." *Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 148 (1st Cir. 2004) (citations and internal quotation marks omitted).

In the instant case, the court believes, at least preliminarily, that the contract in question -- the 2007 Profit Sharing Agreement -- is susceptible to reasonable interpretations presented by each side and, hence, ambigous. On the one hand, for example, UMG/Machete asserts that the agreement does not "implicitly confer any benefit on any Plaintiffs." In particular, UMG/Machete references language in the agreement providing that "LT will be solely responsible for compensating the [producers] it may engage to assist with the recordings." (Document No. 24, ¶ E(2).) This language, UMG/Machete continues, makes clear that Machete will not have any obligations to individual producers engaged by LT, such as Plaintiffs.

Plaintiffs, in contrast, assert that other language in the 2007 Profit Sharing Agreement demonstrates that they *are* third-party beneficiaries. Plaintiffs note that the agreement specifically states that "LT and its Principal will also furnish the services of [the Plaintiffs] to the Label." (Doc. 24 ¶ E(2).) In another section, Plaintiffs argue, the agreement states "[a]ll artist contracts owned or controlled by Mas Flow, LT, any affiliated companies and/or Principals, shall also be transferred to the Label upon complete execution hereof." (*Id.* ¶ T) Further, Plaintiffs assert, the agreement expressly states that Machete will contribute to the payment of certain "LT Producers."

(*Id.* ¶ K(2).)[4]

In the end, the court believes that the question of whether Plaintiffs are third-party beneficiaries of the 2007 Profit Sharing Agreement raises factual questions which cannot presently be resolved via the existing motion to dismiss. *See Baladevon, Inc. v. Abbott Labs., Inc.*, 871 F. Supp. 89 (D. Mass. 1994) (noting that when different provisions of a contract "read in context, [a]re each susceptible of different reasonable interpretations, they present[] questions of fact that c[an] not be resolved on a motion to dismiss") (citing *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir. 1981)). Accordingly, the court will recommend that UMG/Machete's motion to dismiss be denied at this time with respect to Count X.

B. Daddy Yankee Defendants' Motion to Dismiss

The Daddy Yankee Defendants' motion, as noted, targets both the merits (Rule 12(b)(6)) and personal jurisdiction/venue concerns. Because the court believes that personal jurisdiction does not lie over these Defendants, it will go directly to that issue. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over . . . the parties (personal jurisdiction).") (citation omitted). The court begins with El Cartel and Los Cangris and then turns to Daddy Yankee himself.

---

[4] Specifically, the agreement states as follows: "Machete will pay the applicable LT Producers an advance in the amount of Four Thousand Dollars ($4,000.00) upon Delivery of each such track to Machete and a royalty of up to 3% to be taken out of the artist royalty . . . . Otherwise LT shall fund such amounts." (*Id.*)

1. *Piercing the Corporate Veil of El Cartel and Los Cangris*

Plaintiffs' argument with regard to this court's personal jurisdiction over El Cartel and Los Cangris is dependent on piercing the corporate veil to impute any contacts by Daddy Yankee himself to either corporate entity. Accordingly, the Daddy Yankee Defendants argue, preliminarily, that Plaintiffs have not proffered evidence that would justify such corporate veil-piercing. The court agrees.

When analyzing jurisdiction, courts are to respect corporate formalities unless a party presents evidence that would justify piercing the corporate veil. *See United Elec. Radio & Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992) ("Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent."). Plaintiffs have done nothing to fulfill their high burden of proof in this regard. *Velazquez v. P.D.I Enterprises, Inc.*, 141 F. Supp. 2d 189, 193 (D.P.R. 1999) (citing *United Elec., supra*, at 1083-84; *Schaefer v. Cybergraphic Systems, Inc.,* 886 F. Supp. 921, 925 (D. Mass. 1994)). This is so no matter what test of veil- piercing might apply. *See generally United Elec., supra,* at 1091-93.

To be sure, Plaintiffs assert that the Daddy Yankee Defendants "should be treated as one" because Daddy Yankee himself controls El Cartel and Los Cangris and that all Defendants share the same lawyer. But no caselaw, in the court's understanding, justifies veil-piercing on such a slim reed. And Plaintiffs offer no facts or law in this regard other than their own unsupported speculation. At bottom, since Plaintiffs have offered no evidence or law indicating that any corporate veil should be

13

pierced to reach El Cartel or Los Cangris, personal jurisdiction and venue will be addressed only with respect to Daddy Yankee himself.

        2.    *Personal Jurisdiction and Venue over Daddy Yankee*

With regard to Daddy Yankee, Plaintiffs must show both that the Massachusetts long-arm statute grants jurisdiction and that the exercise of jurisdiction is consistent with due process. *Daynard*, 290 F.3d at 52. Here, since neither side mentions the long-arm statute, the court will limit its jurisdictional analysis to due process and venue concerns.

Due process requires the court to find either that it has "specific jurisdiction" over the defendant or "general jurisdiction." *See generally Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir. 2005). Specific jurisdiction exists when a defendant's contacts with the Commonwealth "arise out of" or "relate to" the plaintiff's particular cause of action. *See Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995). General jurisdiction may be found when a defendant has "continuous and systematic" contacts with Massachusetts, even though those contacts do not relate to the particular cause of action. *See Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414-16 (1984). Here, Plaintiffs assert that this court has both specific and general jurisdiction, while Daddy Yankee asserts that the court has neither and, moreover, that venue is improper. In the court's view, Daddy Yankee has the stronger argument on every issue.

        (a)    *Specific Jurisdiction*

The First Circuit uses a three-part test for determining whether a court has

specific jurisdiction over a defendant:

> <u>First</u>, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. <u>Second</u>, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. <u>Third</u>, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Sawtelle*, 70 F.3d at 1389 (emphasis added) (citing cases). *See also United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 620-21 (1st Cir. 2001). The court will address each part of the test, mindful that "[c]entral to each step . . . are the contacts which are attributable to [the] defendant." *Sawtelle*, 70 F.3d at 1389.

(i) <u>Relatedness</u>

With respect to the first prong of the analysis, relatedness, Daddy Yankee argues that the claims do not "arise out of, or relate to" his Massachusetts activities. The court agrees.

No contacts offered by Plaintiffs appear in any way related to this lawsuit. *See Boit*, 967 F.2d at 675 (noting that the plaintiffs "must go beyond the pleadings and make affirmative proof" of material jurisdictional facts). At most, Plaintiffs allege that jurisdiction can be based on four contacts: retail and online sales of Daddy Yankee music in Massachusetts; a 2009 concert in Boston; an endorsement contract with a Massachusetts company, Reebok; and an awards ceremony at Harvard. But Daddy Yankee's undisputed avowals with respect to these contacts demonstrate that there is no relatedness link. (See Amended Decl. Ramon Ayala (Document No. 49).)

For example, Daddy Yankee concedes that he conducted a single concert in Massachusetts in March of 2009 but further avers that he did not perform the song which is the subject of the present action, "Salgo Pa la Calle." (*Id.*) And even though Daddy Yankee acknowledges that he traveled to Massachusetts in 2008 to accept an award, he goes on to note that the award concerned his charitable efforts with high-risk youth, a distinction unrelated to his musical career, and that, in any event, he did not perform "Salgo Pa La Calle" at the award ceremony. (*Id.* ¶ 9.) Furthermore, while Daddy Yankee concedes that he has endorsed a line of Reebok shoes and apparel, he avers that the endorsement contract is between Reebok and DY Merchandising LLC and, again, "Salgo Pa la Calle" was not involved in that endorsement in any way. (*Id.* ¶ 10.) Accordingly, the court concludes that Plaintiffs have not sufficiently established that Daddy Yankee's contacts with Massachusetts in any way relate to their claims.

(ii) <u>Purposeful Availment</u>

As for the second prong of the analysis, Daddy Yankee argues that he did not purposefully avail himself of the benefits and obligations of the Commonwealth's laws. To be sure, Daddy Yankee's affidavit indicates that he made scant travels to Massachusetts that were "voluntary." *See Sawtelle*, 70 F.3d at 1391 (the court must look at whether the defendant's forum activity was voluntary and made it foreseeable to the defendant that he could be brought to Massachusetts). But, "[t]he function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." *Id*. To determine purposeful availment, only contacts related to the Plaintiffs'

claims are considered. *Phillips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999). As indicated, there is no relatedness here and, hence, no purposeful availment.

### (iii) Reasonableness

With regard to the third prong of the analysis, Daddy Yankee contends that making him defend claims in Massachusetts would be unreasonable in light of the "Gestalt" factors. *See Sawtelle*, 70 F. 3d at 1389. The five Gestalt factors are: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Noonan v. Winston Co.*, 135 F. 3d 85, 89 n.2 (1st Cir. 1998).

On balance, the court believes that the Gestalt factors favor finding no jurisdiction over Daddy Yankee. First, as Daddy Yankee argues, requiring him to appear in Massachusetts (factor one) would be unduly burdensome and, therefore, unreasonable; since Daddy Yankee resides in Puerto Rico, defending a lawsuit in Massachusetts would disrupt his work schedule and productivity.

Further, and perhaps even more importantly, Daddy Yankee argues (factor two) that "[t]he most effective relief and resolution of a controversy is had where more of the evidence and witnesses are likely to be located." (Def's Mot to Dismiss Memo at p.17 (citing *Christopher v. Mt. Snow, Ltd.*, 1996 WL 590738 *8 (D. Mass. 1996)).) Here, it is undisputed that the evidence and witnesses, for the most part, are located in Puerto

17

Rico, where the creation of the music in question took place.

Moreover, Daddy Yankee argues (factor four) that Massachusetts does not have sufficient interest in adjudicating the claims against him and (factor five) that the common interest of all sovereigns does not necessarily lie in Massachusetts. The court agrees. As the main claims against Daddy Yankee are under the *federal* copyright statute, there are no compelling state interests for keeping the action against him here. *See Agramonte Gadea v. Citibank N.A.*, 964 F. Supp. 590, 596 (D.P.R. 1997). Thus, even though Plaintiffs themselves certainly have an interest in litigating against Daddy Yankee in Massachusetts (factor three), the court, on balance, finds that the reasonableness factors favor Daddy Yankee.

(b) *General Jurisdiction*

Plaintiffs also posit that general jurisdiction could be exercised over Daddy Yankee. The court disagrees.

As described, general jurisdiction may be found only when a defendant has "continuous and systematic" contacts with the forum state. *Helicopertos*, 466 U.S. at 414-16, *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir. 2006). "For guidance in this factual inquiry, [the court may] look to the types of contacts deemed sufficiently continuous and systematic in other cases." *U.S. v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 620 (1st Cir. 2001). As other jurisdictions have found, nationwide concert tours and records sold in the forum do not indicate continuous and systematic contacts. *See, e.g., Madara v. Hall*, 916 F.2d 1510, 1520 (11th Cir. 1990); *Kinnard v. Kelly*, 2009 WL 1606516 (N.D. Ga. 2009); *Nike, Inc. v. Boy Toy, Inc.*, 1990 WL 96681

18

(D. Or. 1990). Moreover, in this circuit, it appears that the sale of tickets and merchandise in the forum is not sufficient to establish general jurisdiction. *See Sullivan v. Tagliabue*, 785 F. Supp. 1076, 1080 (D.R.I. 1992) (citing *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 470-71 (1st Cir. 1990)).

Here, as previously discussed, Daddy Yankee's contacts with Massachusetts are limited. As Daddy Yankee indicates in his affidavit, he is a resident of Puerto Rico, does not own or lease property in Massachusetts, does not have bank accounts in the forum, and does not file tax returns in Massachusetts. (Amend Decl. Ramon Ayala ¶¶ 6-8.) In short, Daddy Yankee's business contacts with Massachusetts consist only of unrelated activities as a musical artist and, hence, do not equate to "continuous and systematic" contacts sufficient to establish general jurisdiction. Accordingly, the court will recommend that the Daddy Yankee Defendants' motion to dismiss be allowed on personal jurisdictional grounds.

      c.    *Venue*

In the court's view, dismissal of the Daddy Yankee Defendants is also warranted on venue grounds. According to Rule 12(b)(3), "[w]hen an objection to venue has been raised, the burden is on the plaintiff to establish that venue is proper in the judicial district in which the action has been brought." *Transamerica Corp., v. Trans-American Leasing Corp.*, 670 F. Supp. 1089, 1090 (D. Mass. 1987) (citations omitted). That means, for a copyright case such as this, that venue is proper "in the district in which the defendant or his agent may be found." 28 U.S.C. §1400(a). A defendant in a copyright infringement action, however, "may be found" and subject to venue only in the

districts where there is personal jurisdiction. *Linzer v. EMI Blackwood Music, Inc.*, 904 F. Supp. 207, 215 (S.D.N.Y. 1995). As indicated, the court believes that there is no personal jurisdiction over the Daddy Yankee Defendants here. At bottom, therefore, significant venue problems provide a further reason for allowing the Daddy Yankee Defendants' motion to dismiss.

IV. CONCLUSION

For the reasons stated, the court recommends that UMG/Machete's motion to dismiss be ALLOWED as to Counts VII and VIII, but otherwise DENIED, and that the Daddy Yankee Defendants' motion to dismiss be allowed on personal jurisdiction and venue grounds.[5]

DATED: December 13, 2010

    /s/ Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

---

[5] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.